Erik Haas
Nicolas Commandeur
David Slarskey
Matthew Funk
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222
ehaas@pbwt.com
ncommandeuer@pbwt.com
dnslarskey@pbwt.com
mfunk@pbwt.com

*Attorneys for MBIA Insurance Corporation*

**13 CV 0262**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

MBIA INSURANCE CORPORATION

                     Plaintiff,

              v.

FLAGSTAR ABS, LLC,
FLAGSTAR BANK, FSB, and
FLAGSTAR CAPITAL MARKETS CORPORATION.

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

Index No. 13 Civ. 0262

**COMPLAINT**

Plaintiff MBIA Insurance Corporation ("MBIA"), by and through its attorneys, Patterson Belknap Webb & Tyler LLP, alleges the following for its Complaint against defendants Flagstar ABS, LLC, Flagstar Bank, FSB, and Flagstar Capital Markets Corporation (collectively "Flagstar"):

## NATURE OF THE COMPLAINT

1.     This action arises from Flagstar's pervasive breach of warranties and contractual covenants that it made to induce MBIA to issue two financial guaranty insurance policies (the "Policies").  MBIA issued the Policies pursuant to insurance agreements it entered into with Flagstar (the "Insurance Agreements") in connection with two mortgage-backed securitizations Flagstar sponsored in early 2006 (the "2006-1 Transaction") and early 2007 (the "2007-1 Transaction," together with the 2006-1 Transactions, the "Transactions").

2.     The Transactions were mortgage-backed securitizations.  In each transaction, Flagstar aggregated a pool of mortgage loans and sold the pools to trusts (the "Trusts"), which in turn issued securities backed by the cash flows from the loans and the financial guaranty policy issued by MBIA.  In advance of closing, Flagstar represented to MBIA that it had originated or acquired all of the loans, and that each of the loans complied with its underwriting guidelines.  Flagstar gave MBIA a loan schedule (referred to as the "loan tape") that listed important attributes of each loan in the pool.  According to Flagstar's disclosures, the loans were prime closed-end second lien loans, which meant that although recoveries on these second loans were subordinate to the first-lien loans, the probability of default was minimal because the loans were purportedly made to borrowers with the lowest risk of default, the highest credit scores, and ample ability to fully repay the loans.  Additionally, Flagstar not only represented that its internal quality control processes ensured its loans bore the represented attributes, but Flagstar also warranted that it "had no knowledge of any fact that would have led it to expect that any interest in any Mortgage Loan is unlikely to be paid in full when it becomes due and payable."  Further, Flagstar provided historic performance data as evidence that its processes were designed and implemented as represented.

3.      To induce MBIA to guaranty payments due on certain securities, Flagstar made extensive warranties concerning its loans and operations, and attesting to the veracity of the representations it made.  Flagstar's warranties were false.

4.      Flagstar provided two types of warranties to induce MBIA's participation in the Transactions.  First, Flagstar provided broad "Transaction Warranties" in the parties' Insurance Agreements affirming, among other things, that (i) the information Flagstar provided concerning the securitized loans and its operations (including its origination and servicing operations) was not false or misleading, and (ii) the offer and sale of the securities issued by the Trusts, including the related disclosures, complied with applicable securities laws.  These were significant warranties and material considerations for MBIA's execution of the Insurance Agreements and issuance of the Policies.  That is, the Transaction Warranties encompassed, and afforded MBIA contractual grounds to recover for, Flagstar's pre-closing misrepresentations and omissions.  And the warranties are breached based upon the falsity of the representations, regardless of (and without MBIA's having to demonstrate) Flagstar's "knowledge" of the false or misleading nature of its representations.

5.      Second, Flagstar provided extensive "Loan Warranties" concerning the quality and attributes of each loan securitized in the Transactions.  These Loan Warranties included assurances that (i) no "error, omission, misrepresentation, negligence, fraud, or similar occurrence with respect to a Mortgage Loan has taken place on the part of *any person*" involved in the loan origination (emphasis added); (ii) each loan "was originated in good faith and in accordance with [Flagstar's] underwriting guidelines"; (iii) key loan information and metrics Flagstar provided were "correct in all material respects"; (iv) there was no defect in any of the loans that could constitute a "default, breach, violation or event of acceleration" (e.g., borrower

fraud in the application for the loans); and (v) Flagstar "had no knowledge of any fact that would have led it to expect that any interest in any Mortgage Loan is unlikely to be paid in full when it becomes due and payable."

6.     These Loan Warranties were essential and fundamental consideration for MBIA's participation in the Transactions.  By the warranties, Flagstar assumed (i) the burden of ensuring the veracity of the represented loan attributes, and (ii) the risk of loss in the event the representations were false.  This negotiated risk allocation made sense, as Flagstar was the only Transaction participant that had originated or acquired the loans, owned the loan files, had purportedly made sure that the loans were underwritten to its own guidelines, and subjected the loans to its quality control processes.  The Loan Warranties thus allowed the Transaction participants, including MBIA, to assess their risk of loss on securities backed by loans *bearing the represented and warranted attributes*.

7.     Reflecting the significance of the Loan Warranties, Flagstar covenanted to (i) give *prompt* notice of any loan that did not comply with the Loan Warranties, (ii) cure any breach within 90 days of discovering or receiving notice of a breach, and, absent such cure, (iii) promptly remove the breaching loan from the applicable Trust by repurchase or substituting a conforming loan.  This contractual "Repurchase Protocol" was designed to supplement – not to supplant – Flagstar's obligation of compliance with its warranties, and to afford an *expeditious* remedy for any "one-off" breaching loan that circumvented Flagstar's represented protocols. Flagstar's adherence to its warranties and commitment to an expeditious remedy, in the event a non-conforming loan was securitized, were particularly important to MBIA because MBIA's insurance policy irrevocably guaranteed timely payment of interest and ultimate repayment of

principal on the bonds.  The primary source of payments to investors/bondholders was the regularly scheduled principal and interest payments to be made by the borrowers.

8.      Flagstar materially breached the parties' Insurance Agreements and pierced the heart of the parties' bargain by selling to the Trusts collateral pools replete with breaching loans, which increased MBIA's risk of loss on the Policies, and thereafter, by failing to provide notice of the breaching loans and fundamentally frustrating the Repurchase Protocol.

9.      The 2006-1 Transaction involved approximately 8,300 purportedly prime, closed-end second loans, with a total principal balance of approximately $400 million.  Since the Transaction closed in April 2006, the securitized loans have defaulted and have been charged-off at an extraordinary rate, causing MBIA to make substantial payments in accordance with the terms and provisions of the Policies.  The 2006-1 Trust has incurred cumulative losses of approximately $51 million, leading to claim payments made by MBIA of more than $32 million. As these extraordinary defaults and charge-offs began to mount, MBIA exercised its post-closing right, bestowed by the Transaction documents, to inspect the loan files of the securitized loans and, at substantial expense, reviewed both a random sample of loans from the securitized pools, and a sample of delinquent, defaulted, and/or charged-off loans, with an aggregate principal balances totaling more than $58 million.  Only then did MBIA discover that over 90% of the loans in each sample breached the Loan Warranties.

10.      The 2007-1 Transaction involved approximately 12,500 purportedly prime, closed-end second loans, with a total principal balance of approximately $625 million. Since it closed in March 2007, the securitized loans in the 2007-1 Transaction also have defaulted and charged-off at a remarkable rate, with the Trust incurring cumulative losses of over $174 million, requiring MBIA to make more than $133 million in claim payments.  Based on a

review of both a random sample of loans from the securitized pools, and a sample of delinquent, defaulted, and/or charged-off loans, with aggregate principal balances totaling more than $116 million, MBIA discovered that over 90% of the loans in each sample breached the Loan Warranties.

11.     Having originated or acquired all of the loans in the transaction, and having thereafter purportedly subjected all the securitized loans to its touted quality control processes, Flagstar had notice (or at least was on inquiry notice) that the pools that it sold into the Transactions were rife with breaching loans.  Additionally, Flagstar represented to MBIA that it had 80 underwriters reviewing and validating all of the information on the applications. Furthermore, Flagstar was the original Servicer of the loans on both Transactions.[1]  As Servicer, Flagstar was responsible for, among other things, collecting mortgage payments and handling loan modifications and foreclosure proceedings, and so continued to receive information about the borrowers after the Transactions closed.  Borrower information received by Flagstar in its role as Servicer that contradicted the information used to originate the loan also put Flagstar on notice of breaching loans.

12.     Flagstar therefore was obligated to provide prompt notice of the breaches to MBIA and the other Transaction participants, and absent a cure within 90 days, repurchase or substitute the breaching loans pursuant to the Repurchase Protocol – without prompting from MBIA or other Transaction participants.  Flagstar did not do so.

13.     Moreover, even after being notified by MBIA of more than 2,300 breaching loans, with an original principal balance of over $145 million, Flagstar declined to review, and failed to respond, to all but 127 of MBIA's repurchase demands.  In flagrant breach

---

[1] On April 28, 2010, MBIA exercised its contractual rights to remove Flagstar as Servicer on both Transactions.

of its contractual obligations, ***Flagstar has refused to repurchase even a single defective loan***. And, contrary to Flagstar's representation over a year ago that it would conduct a loan-by-loan review and provide to MBIA its position as to each of the loans identified by MBIA, Flagstar has not responded with respect to a single additional loan.

14.     Flagstar materially breached its Transaction Warranties by making false and misleading representations and disclosures concerning its loans and operations and thereby, among other things, misrepresenting the operational and insurance risks associated with the loan pools it was originating and securitizing. Flagstar pervasively breached its Loan Warranties by selling to the Trusts pools comprised of loans that did not conform to the represented attributes. And Flagstar breached its covenants by failing to give prompt notice of the breaching loans and by entirely frustrating and rendering null the Repurchase Protocol.

15.     In sum, Flagstar has materially breached, and defeated the object of, the parties' Insurance Agreements, resulting in significant and on-going harm to MBIA. As a consequence, MBIA is entitled to relief, including relief sufficient to place MBIA in the position it would be in had it not entered into the Insurance Agreements and issued the Policies.

## THE PARTIES

16.     MBIA is a New York corporation with its principal place of business at 113 King Street, Armonk, New York 10504.

17.     Flagstar Bank, FSB ("Flagstar Bank") is a federally chartered savings bank organized under the laws of the state of Michigan, with its principal place of business at 5151 Corporate Drive, Troy, Michigan 48098.

18.     Flagstar Capital Markets Corporation ("FCMC") is a Delaware corporation and wholly owned subsidiary of Flagstar Bank, with its principal place of business at 5151 Corporate Drive, Troy, Michigan 48098.

19.     Flagstar ABS LLC ("Flagstar ABS") is a Delaware limited liability company and wholly owned subsidiary of Flagstar Bank, with its principal place of business at 5151 Corporate Drive, Troy, Michigan 48098.

**JURISDICTION AND VENUE**

20.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

21.     The Court has personal jurisdiction over Flagstar because, in Section 6.05(a) of both the 2006-1 and 2007-1 Insurance Agreements, Flagstar agreed to "irrevocably submit to the jurisdiction of the United States District Court for the Southern District of New York" in any suit brought against it in connection with the Transactions, and waived "any claim that it is not personally subject to the jurisdiction" of the Court.

22.     Venue is proper in the Southern District of New York because, in Section 6.05(a) of both the 2006-1 and 2007-1 Insurance Agreements, Flagstar agreed that all claims in connection with the Transactions "may be heard or determined in" the Southern District of New York to the extent permitted by law.  Flagstar also waived any claim that "the venue of the suit, action or proceeding is improper" in the Southern District of New York.

**FACTUAL ALLEGATIONS**

I.     **FLAGSTAR PROVIDED FALSE AND MISLEADING INFORMATION ABOUT ITS OPERATIONS AND THE SECURITIZED LOANS**

23.     In written and oral communications, Flagstar provided false and misleading information to MBIA concerning (i) Flagstar's business practices related to the origination, acquisition, quality control, and securitization of mortgage loans, and (ii) the attributes and quality of the loans securitized in the Transactions.  The falsity of the disclosures

8

constitutes a material breach of the Insurance Agreements, and specifically the Accuracy of Information and Compliance with Securities Law warranties.

### A.   The 2006-1 Transaction

24.    In February 2006, Flagstar contacted MBIA through its investment banker and securitization structuring agent, J.P. Morgan Securities ("JPM"), to solicit MBIA's participation as the note insurer for the 2006-1 Transaction.[2]  Flagstar represented that the loans to be securitized in the 2006-1 Transaction were high-quality, primarily full-documentation prime loans, and asked MBIA to bid on issuing a policy guaranteeing payments to be made by the 2006-1 Trust.  To further assure MBIA regarding the purported integrity of its representations, Flagstar advised MBIA in a March 2, 2006 email, sent on its behalf by JPM, that it intended to purchase all of the issued securities, and that the entire transaction was simply a means of satisfying regulations concerning capital requirements for the bank.  This statement was false or misleading because Flagstar failed to disclose that, in fact, it also intended to use the securitization as a way of transferring to MBIA the known, undisclosed risks associated with the defective loans, and intended to profit by obtaining insurance claims payments when the loans eventually defaulted and were charged off.  MBIA continues to make claims payments on its insurance policy, of which Flagstar is a direct beneficiary, thus realizing the benefits of its false or misleading statements.

#### 1.   *Flagstar's Operations*

25.    Shortly thereafter, Flagstar provided MBIA with information concerning the claimed strength of its quality control procedures to persuade MBIA to participate in the

---

[2] MBIA was first introduced to Flagstar by JPM in 2005, for a transaction involving the securitization of approximately $600 million in Flagstar loans.  That transaction closed in December 2005, and was ultimately insured by a different financial guarantor that, like MBIA here, has sued Flagstar for providing

2006-1 Transaction.  Specifically, on March 29, 2006, Flagstar forwarded to MBIA a compact disk containing presentations and disclosures relating to its operations.  The materials included a copy of Flagstar's "Quality Control Policy," dated December 2005.  According to its Quality Control Policy, once Flagstar originated or acquired loans, it conducted regular quality control processes in a manner designed "to assure that all mortgages [were] originated and serviced in accordance with all pertinent agency, insurer, guarantor and investor guidelines, regulations, and sound mortgage banking and accounting principles; to guard against dishonest, misrepresented or negligent acts; and guard against errors, omissions and misrepresentations by officers, employees, or other authorized persons and to protect investors from unacceptable risk, and assure swift and appropriate corrective action."

26.     Flagstar represented that quality control review took place subject to a detailed protocol that Flagstar provided to MBIA, and included a complete evaluation of "[e]vidence that all underwriting conditions were satisfied," "[c]ompliance with investor eligibility and underwriting guidelines," "sufficiency of documentation," and the "[r]eliability of underwriting judgments."  Flagstar further represented that "[t]he Quality Control program provides feedback to the organization about its loan origination and servicing practices and this feedback is used to adjust and improve the origination and servicing of all of its mortgage programs," and that "[t]he primary purpose of the program is to verify the accuracy of legal documents, credit documentation, property appraisals, and underwriting decisions."

27.     With respect to second lien mortgages in particular, which comprised the collateral for the Transactions, Flagstar represented that it conducted regular "Quality Control Audits" from "a statistical sample of the total number of files available for audit selection that

false assurances as to the quality of the securitized loans and for failing to honor its contractual obligations.

provides a 95% confidence level with 2% precision … or a 2 1/2 % straight percentage audit methodology," along with review of all loans experiencing first payment defaults and Federal Housing Authority early payment defaults within the first six payments.  The stated purpose of these Quality Control Audits was to identify "[a]ny minor or major discrepancies or findings of misrepresentation," which would "be thoroughly investigated and all necessary action taken" if found.  Flagstar represented that it prepared Quality Control Audit Summaries from the Quality Control Audits, and presented MBIA with a sample, dated July 2, 2004, as an example of the manner in which it summarized and evaluated the results.

28.     Finally, Flagstar represented that it generated quarterly reports "of previous months [*sic*] audit results to be used in future month's [*sic*] trend analysis," which it presented to its Board of Directors to assure that "[p]roper steps will be taken to correct discrepancies and alleviate the repetition of noted errors."  The Quality Control Policy stated that "[i]f patterns of errors, discrepancies, or fraud [were] detected, the scope of the audit c[ould] be changed to include additional reviews and/or more in-depth reviews."

29.     The following day, by email dated March 30, 2006, Flagstar provided MBIA with a copy of Flagstar's residential underwriting guidelines, dated September 2005, that represented, among other things, that all loan files underwent a full underwriting review process. This process purportedly included making sure the loan application package had sufficient information to reach an underwriting decision and a case-by-case review of a borrower's credit-worthiness.

30.     Then, during MBIA's April 5, 2006, visit to Flagstar's headquarters, Flagstar represented that it had 80 underwriters reviewing and validating all of the information on its loan applications, and that the reviewers purportedly evaluated the validity of the

appraisals obtained.  Flagstar also assured MBIA that it employed various fraud-detection tools to identify problem loans, explaining these processes in detail.

31.     After the site visit, Flagstar provided additional assurances in response to MBIA's inquiries regarding its verification procedures with respect to those loans originated through reduced documentation programs.  Flagstar responded with additional false and misleading representations.  For example, by email dated April 27, 2006, Steve Brooks, Flagstar Executive Vice President and Chief Operations Officer of Lending, responded to MBIA's inquiries by assuring MBIA that the loans "perform quite well because we take additional steps in underwriting to ensure the loan makes sense. *We verify whether the stated income makes sense for the occupation, based on salary.com.  We also verify assets and determine that the assets make sense for the income*.  We also enforce reserve requirements ... ."

32.     These and similar representations as to Flagstar's business practices were false.  The falsity is confirmed by the glaring and pervasive breach rate found in MBIA's review of the loan files.  Flagstar's underwriters either routinely ignored or overrode obvious loan defects, systematically disregarded the unreasonableness of represented information pertaining to loans that Flagstar originated or acquired, and cited false or inadequate "compensating factors" to justify the deficiencies in loan applications, thus rendering Flagstar's representations about its scrutiny of the loans false or misleading.  Also, had the quality control review of Flagstar's loans been conducted in the manner represented to MBIA, it would have revealed that an overwhelming number of the loans in the Transactions were defective.

### 2.     *Loan Attributes*

33.     Flagstar also provided MBIA with detailed information concerning the loans to be securitized in the 2006-1 Transaction.  This included summary reports and "loan tapes," or files containing critical attributes of the loans to be securitized, such as the one sent by

JPM on behalf of Flagstar to MBIA on April 7, 2006, setting forth the borrowers' credit profiles and residency status with respect to the mortgaged properties, the combined loan-to-value ("CLTV") ratio for the properties, and debt-to-income ("DTI") ratio of the borrowers (i.e., the ratio of the total monthly debt payments of the borrowers to their monthly income). These were fundamental indicators of the borrowers' ability and likelihood to repay the loans, and thus information MBIA used to assess the pool-wide risk of issuing the Policy.

34.     As set forth in more detail in the following paragraphs, the information that Flagstar provided to MBIA about the pool-wide and individual loan characteristics was untrue and materially misleading, as the loans were substantially riskier than represented, as MBIA confirmed during its re-underwriting review.

### 3.     *Loan Due Diligence*

35.     Flagstar's agent, JPM, retained The Bohan Group to conduct loan file re-underwriting on a sample of the 2006-1 loans before the close of the 2006-1 Transaction. The re-underwriting purportedly was an independent check on Flagstar's origination, acquisition, and underwriting of the securitized loans. On April 19, 2006, JPM conveyed to MBIA a summary of the re-underwriting findings. Those results represented that of the 200 sampled loans, only 2 loans were represented as "EV3," meaning that they did not meet the threshold requirements for securitization. That information was false and misleading. In fact, an overwhelming majority of the loans sampled and reviewed by JPM and Flagstar during the due diligence process should have been graded as fatally defective "EV3" loans, and MBIA should accordingly have been advised by Flagstar and JPM that the pool of loans did not meet the warranted characteristics.

### 4.     *Portfolio Performance*

36.     Based upon communications with MBIA, Flagstar knew that MBIA was particularly interested in its historical loss rate on similar collateral as a measure of the integrity

of Flagstar's origination practices.  MBIA sought from Flagstar historical loss data as evidence

that Flagstar's business practices were designed and implemented as represented.

37.     At MBIA's request, Flagstar provided information on the historical

performance of its second lien mortgage portfolio.  For example, in an April 7, 2006 email,

Flagstar supplied an analysis of its losses on previous "vintages" of loans (i.e., loans originated

during a particular year), along with several reports purportedly reflecting the performance of

Flagstar's loans originated between 1995 and 2005.  Flagstar provided these results for the

specific purpose of assuring MBIA of the purportedly high quality of Flagstar's origination and

acquisition practices.

38.     These reports showed a substantially lower loss rate for 2004 loans as

compared to 2003 loans, and that Flagstar had not had any losses on second-mortgage loans

originated in 2005.  The data, however, was materially misleading for the purpose it was

provided (i.e., to assure MBIA about the consistency of collateral) because Flagstar knew and

failed to disclose that it had systematically departed from its stated underwriting and origination

practices.

39.     Specifically, along with providing the reports, Flagstar represented in an

April 20, 2006 email that the "credit quality of [its] originations ha[d] been fairly stable as

measured by FICO scores," that "[CLTVs] have also been relatively stable with a slight

improvement since 2003," and, in a March 8, 2006 email, that in November 2005, "a cap was

imposed for DTI on stand alone seconds."  These representations were misleading at best.  Based

upon MBIA's subsequent review of the loan files, even if Flagstar had a stated policy of

imposing a cap on DTI, it systematically departed from that policy, e.g., approving loans to

borrowers reporting unreasonably high or false incomes and failing to properly take into account

borrowers' liabilities. And whether or not credit quality had been "fairly stable as measured by FICO scores," Flagstar knew that there were other problems with the credit quality, not reflected in the borrowers' credit scores: Flagstar systematically originated loans to borrowers without adequate assets, who did not have a reasonable way of repaying the loans, or who otherwise failed to qualify for the loans they were given. Moreover, though Flagstar reported stable CLTVs, it failed to disclose that those CLTV ratios were often calculated based upon stale appraisals or in other ways that violated the underwriting guidelines. Flagstar concealed these facts behind its false and misleading partial disclosures.

### 5.    *Ratings*

40.    Additionally, MBIA's bid required certain minimum ratings for the securities from the major credit rating agencies, Standard & Poors ("S&P") and Moody's. Flagstar represented by its acceptance of that bid that it believed the securities would warrant that rating. The crucial component of the rating was the quality of the collateral. Though Flagstar secured the minimum rating for both deals from the rating agencies, this rating was erroneous because it was based on Flagstar's false and misleading information concerning collateral quality. Flagstar's representation that the loan collateral warranted the ratings required by MBIA was false and misleading because Flagstar knew, based on its role as originator or acquirer, that the loans had not been originated to the underwriting standards presumed by the ratings agencies. Based upon the true nature of the collateral, as discovered by MBIA, Flagstar knew that the agencies would have issued a far lower rating (or no rating) based on the same deal structure, thus resulting in no insurance policy being issued.

### B.    The 2007-1 Transaction

41.    In a January 5, 2007 telephone call, Flagstar again solicited a bid from MBIA, this time for the 2007-1 Transaction.

### 1.   Flagstar's Operations

42.    Flagstar represented to MBIA that it complied with its written policies previously disclosed to MBIA in connection with the 2006-1 Transaction.  In a March 1, 2007 telephone call with MBIA, Flagstar reiterated its prior representations, stating that its practices had not materially changed.  Furthermore, in the 2007-1 Offering Circular used to market the securities to investors, Flagstar made additional representations concerning Flagstar's origination and quality control procedures and the loan pool characteristics.  For example, the Offering Circular states that the loan underwriter is "responsible for checking the data integrity and reviewing credit" and utilizes various integrated quality control tools.  As with other representations concerning underwriting and loan quality, these representations were false and misleading, and thus in violation of federal and state securities laws.

43.    Flagstar did not disclose that throughout 2006 it had increasingly departed from its standards, and that the quality of the loans it originated, acquired, and proposed to securitize had declined even further, as ultimately reflected in the higher default rate in the 2007-1 Transaction.

### 2.   Loan Attributes

44.    Just as it did in connection with the 2006-1 Transaction, Flagstar provided MBIA with loan tapes for the 2007-1 Transaction, such as the one sent by JPM on its behalf in a January 22, 2007 email, containing false and inaccurate loan data, with similar defects as the data supplied for the 2006-1 Transaction.

### 3.   Loan Due Diligence

45.    As it had done in connection with the 2006-1 Transaction, Flagstar and JPM presented MBIA with summary results from the re-underwriting of the loans in the 2007-1 Transaction undertaken by The Bohan Group.  This time, of the 301 loans reviewed by

Bohan, all but 29 (which Flagstar removed from the securitization pool) were ultimately cleared after discussions between Flagstar, JPM, and Bohan. Those re-underwriting results were false and misleading, as demonstrated by MBIA's subsequent loan review.

### 4. *Portfolio Performance*

46.    Flagstar once again provided MBIA with information on the performance of its second lien mortgage portfolio. By email on March 2, 2007, Flagstar provided updated origination and loss results. As with the data provided in connection with the 2006-1 Transaction, however, the data was materially misleading for the purpose it was provided because Flagstar knew and failed to disclose that it had systematically departed from its purported origination practices.

### 5. *Ratings*

47.    Finally, like the 2006-1 Transaction, MBIA's bid on the 2007-1 Transaction required certain minimum ratings from S&P and Moody's for the securities. Flagstar's representation that it believed the loan collateral warranted the ratings required by MBIA was again false and misleading because Flagstar knew, based on its role as originator or acquirer, that the loans had not been originated to the underwriting standards represented to the ratings agencies. Based upon the true nature of the collateral, as discovered by MBIA, Flagstar knew that the agencies would have issued a far lower rating (or no rating) based on the same deal structure, thus resulting in no insurance policy being issued.

48.    All the foregoing false and misleading statements made by Flagstar constitute material breaches of the Transaction Warranties – including the Accuracy of Information and Compliance with Securities Law warranties – found in the Insurance Agreements and set forth in detail below.

## II.   FLAGSTAR EFFECTUATES THE TRANSACTIONS

49.    Flagstar effectuated each Transaction through a similar series of agreements.  These agreements were executed between Flagstar's affiliates and the Trusts created to hold the loans as collateral for the securities that the Trusts issued.  Two transfers are relevant here.

50.    First, one Flagstar affiliate, acting as a "Seller," aggregated pools of mortgages that Flagstar originated and acquired and sold those pools to a second affiliate acting as the "Purchaser" pursuant to a "Purchase Agreement."  For the 2006-1 Transaction, Flagstar Bank (the "Seller") sold loans to its affiliate Flagstar ABS (the "Purchaser") pursuant to the Purchase Agreement dated April 28, 2006.  For the 2007-1 Transaction, FCMC (the "Seller") sold the loans to Flagstar ABS (the "Purchaser") pursuant to a Purchase Agreement dated March 1, 2007.  Flagstar Bank, as the "Sponsor," also was a party to the 2007-1 Transaction.

51.    Second, after purchasing the loans from its affiliate, Flagstar ABS then conveyed the loans to the securitization Trusts, which issued the securities.  In the 2006-1 Transaction, the conveyance was effectuated pursuant to a Sale and Servicing Agreement (the "SSA"), dated April 28, 2006, between Flagstar ABS (the "Depositor"), Flagstar Bank (the "Seller and Servicer") and the Trust and Indenture Trustee.  For the 2007-1 Transaction, the conveyance was effectuated pursuant to the Pooling and Servicing Agreement (the "PSA"), dated March 1, 2007, between Flagstar ABS (the "Depositor"), FCMC (the "Seller"), Flagstar Bank (the "Sponsor and Servicer") and the Trustee.

52.    Flagstar then entered into Insurance Agreements with MBIA pursuant to which MBIA issued its Policies for the two securitizations.  Specifically, as to the 2006-1 Transaction, Flagstar Bank (as "Servicer and Seller"), Flagstar ABS (as "Depositor") and the Trust entered into an Insurance Agreement dated April 28, 2006 with MBIA.  For the 2007-1

Transaction, Flagstar Bank (as "Servicer and Sponsor"), FCMC (as "Seller") and Flagstar ABS

(as "Depositor") entered into the Insurance Agreement dated March 15, 2007 with MBIA.

### III.    FLAGSTAR WARRANTS THE TRUTH OF INFORMATION PROVIDED TO MBIA AND THE ATTRIBUTES OF THE LOANS

53.    As previously set forth, Flagstar made two types of contractual

representations and warranties to implement the parties' negotiated risk-allocation.  The

Transaction Warranties concerned, generally, the attributes of the Transaction loan pool in the

aggregate and the truthfulness of the information provided to MBIA about Flagstar's mortgage-

lending operations, practices and protocols, and related disclosures.  The Loan Warranties

concerned the characteristics of each individual loan that was securitized.  The Transaction and

Loan Warranties MBIA obtained were substantially identical for both the 2006-1 and 2007-1

Transactions.  Flagstar's certification as to the truth of the Transaction and Loan Warranties was

an express condition precedent to MBIA's issuance of the Policies.  *See, e.g.*, Insurance

Agreements Section 3.01(e).

### A.    The Transaction Warranties

54.    The Transaction Warranties are embodied in Section 2.01 of the Insurance

Agreements between MBIA and Flagstar.  The Transaction Warranties include the following

from both Insurance Agreements[3]:

> (j) *Accuracy of Information.*  Neither the Transaction Documents
> nor other material information relating to the Mortgage Loans, the
> operations of the Servicer, the Seller or the Depositor (including
> servicing or origination of loans) or the financial condition of the
> Servicer, the Seller or the Depositor or any other information
> (collectively, the "Documents"), as amended, supplemented or
> superseded, furnished to the Insurer by the Servicer, the Seller or

---

[3] The 2007-1 Transaction Warranties in the Insurance Agreement were made jointly by Flagstar Bank, Flagstar ABS, and FCMC, and the Accuracy of Information warranty additionally covered information relating to Flagstar Bank as Sponsor.  The 2006-1 Transaction Warranties in the Insurance Agreement were made jointly by Flagstar Bank and Flagstar ABS.

the Depositor contains any statement of a material fact by the Servicer, the Seller or Depositor which was untrue or misleading in any material adverse respect when made. [...]

(k) *Compliance With Securities Laws*. The offer and sale of the Securities comply in all material respects with all requirements of law … Neither the offer nor the sale of the Securities has been or will be in violation of the Securities Act or any other federal or state securities laws. [...]

55.     The Transaction Warranties thus broadly attest that all of the information provided by Flagstar concerning the mortgage loans, Flagstar's lending operations (e.g., its origination, underwriting, and quality control), the Transaction due diligence, or any representations used to market the securities were true, accurate, and complete. Any material misstatement or omission with respect to those disclosures therefore is a breach of these provisions, regardless of whether or not Flagstar knew of such misstatement or omission.

**B.     The Loan Warranties**

56.     The Insurance Agreements also incorporate the Loan Warranties, which are listed in Purchase Agreements executed to effectuate the sale of loans to the Trusts, as discussed below. Specifically, in Section 2.01(l) of both Insurance Agreements, Flagstar agreed that the Loan Warranties were made "to, and for the benefit of, the Insurer as if the same were set forth in full herein."

57.     As noted, the Loan Warranties themselves are located in Section 3.02 of the respective Purchase Agreements. Consistent with Section 2.01(1) of the Insurance Agreements, the Loan Warranties were made expressly for the benefit of MBIA pursuant to

Section 2.04(a) of the SSA (for the 2006-1 Transaction) and Section 2.03(b) of the PSA (for the 2007-1 Transaction).[4]  Section 2.04(a) of the SSA provides, for example:

> The Seller by this reference repeats and incorporates in this Agreement each representation and warranty made by it in Section 3.02(a) of the Purchase Agreement (other than Section 3.02(a)(1) and (a)(2)) to the Indenture Trustee, the Trust, **and the Note Insurer [MBIA]**... .

Section 2.03(b) of the PSA contains nearly identical language.

58.     As the agreements provide, the Loan Warranties are enforceable against Flagstar whether or not it knew that the Loan Warranties were false when it provided them.

Section 2.04(b) of the SSA provides:

> If the substance of any representation and warranty with respect to a Mortgage Loan in this Section made to the best of the Seller's knowledge or as to which the Seller has no knowledge is inaccurate and the inaccuracy materially and adversely affects the interest of the Trust, the Noteholders or the Note Insurer in the related Mortgage Loan then, *notwithstanding that the Seller did not know the substance of the representation and warranty was inaccurate at the time the representation or warranty was made*, the inaccuracy shall be a breach of the applicable representation or warranty.

Section 2.03(b)(3) of the 2007-1 PSA contains nearly identical language.[5]

59.     The Loan Warranties include, among others, the following with respect to each of the loans in the 2006-1 Purchase Agreement:

> No error, omission, misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including, without limitation, the related borrower, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan. Section 3.02(a)(65).

---

[4] For the 2006-1 Transaction, the Loan Warranties were repeated and incorporated in the SSA by Flagstar Bank as Seller.  For the 2007-1 Transaction, the Loan Warranties were repeated and incorporated in the PSA by Flagstar Bank as Sponsor and FCMC as Seller.

[5] For the 2006-1 Transaction, this representation was made by Flagstar Bank as Seller.  For the 2007-1 Transaction, the representation was made by Flagstar Bank as Sponsor and FCMC as Seller.

Each Mortgage Loan was originated in good faith and in accordance with the Seller's underwriting guidelines. Section 3.02(a)(36). *See also* Section 3.02(a)(60).

There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note ... Section 3.02(a)(35).

As of the Closing Date, the information in the Mortgage Loan Schedule with respect to the Mortgage Loans is correct in all material respects. Section 3.02(a)(4).

At origination, each Mortgage Loan and the related Mortgage Note complied in all material respects with applicable local, state and federal laws, including all applicable predatory and abusive lending laws to which Seller is subject, usury, truth-in-lending, real estate settlement procedures, consumer credit protection, equal credit opportunity or disclosure laws applicable to the Mortgage Loans... . Section 3.02(a)(14).

The Combined Loan-to-Value Ratio for each Mortgage Loan was not in excess of the percentage specified in the Adoption Annex. Section 3.02(a)(18).

As of the Cut-Off Date, the Mortgage Loans had the characteristics set out in the Adoption Annex in respect of the following: weighted average Combined Loan-to-Value Ratio; range of Combined Loan-to-Value Ratios; percentage of primary residences; weighted average FICO score; range of FICO scores; Weighted Average Loan Rate; range of Loan Rates; weighted average original stated term to maturity; range of original term to maturity; range of remaining term to maturity; average Asset Balance; and percentage of the Mortgage Loans that have their respective Mortgaged Properties located in the top five states, measured by aggregate Asset Balances. Section 3.02(a)(39). *See also* Sections 3.02(a)(17, 29-34).

The Mortgage File for each Mortgage Loan contains each of the documents specified to be included in it. Section 3.02(a)(13).

At the time of origination the Seller had no knowledge of any fact that would have led it to expect that any interest in any Mortgage Loan is unlikely to be paid in full when it becomes due and payable. Section 3.02(a)(74).

The 2007-1 Purchase Agreement contains nearly identical warranties.[6]

      60.     Thus, the Loan Warranties are breached by, among other violations, any loans (i) issued to any borrower, or involving any party, who misstated a borrower's income, liabilities, occupancy, or the value of the property, or who engaged in any deceit or unreasonable conduct in the origination or securitization of a loan; or (ii) that violate the applicable underwriting guidelines, including loans issued to borrowers who have no reasonable ability to repay them.  As discussed below, the loan pool is replete with such breaches and many others.

### C.    Flagstar Agrees to Provide Notice of and Cure, or Remove and Compensate the Trust for, Breaching Loans

      61.     For each Transaction, Flagstar agreed that it would provide notice to MBIA and other Transaction participants of any breaching loan.  Flagstar also agreed to cure any breach of the Loan Warranties within 90 days of discovery or notice, and if the breach could not be cured, it would remove the breaching loan from the Trust and either pay a repurchase price for the breaching loans or substitute a non-breaching loan for the breaching Trust Loan pursuant to the Repurchase Protocol.  Section 2.03(f) of the 2007-1 PSA provides that:

> Upon discovery by any of the parties hereto of a breach of a representation or warranty set forth in Section 2.03(a) or (b) that materially and adversely affects the interests of the Certificateholders or the Certificate Insurer [MBIA] in any Mortgage Loan, the party discovering such breach shall give prompt notice thereof to the other parties and the Certificate Insurer. Each of the Servicer and the Seller (each a "Representing Party) hereby covenants … that within 90 days of the earlier of the discovery by [Flagstar] or receipt of written notice by [Flagstar] from any party of a breach … it shall cure such breach in all material respects, and if such breach is not so cured, shall … remove such Mortgage Loan (a "Deleted Mortgage Loan") from the Trust Fund and substitute in its place a Replacement Mortgage Loan … or (ii) repurchase the affected Mortgage Loan or

---

[6] The Loan Warranties in the 2006-1 Purchase Agreement were made by Flagstar Bank as Seller.  The Loan Warranties in the 2007-1 Purchase Agreement were made by FCMC as Seller and Flagstar Bank.

Mortgage Loans from the Trustee at the Purchase Price in the manner set forth below … .[7]

62.    Section 2.04(d) of the 2006-1 SSA provides a mechanism for accomplishing the same objective, i.e., that Flagstar Bank, as Seller, "shall use all reasonable efforts to cure in all material respects any breach of any of the [Loan Warranties] … within 90 days of becoming aware of it or, … all interest of the Trust in the Defective Mortgage Loan shall … be automatically retransferred without recourse, representation, or warranty to the Seller… ." Under such circumstances, the Indenture Trustee shall calculate the amount of payment to be made by the Seller for that Defective Mortgage Loan, or the required amount of conforming loans that must be substituted in as a replacement for the Defective Mortgage Loan.  SSA Section 2.07.  As with the PSA, the SSA provides that a breach of the representations and warranties exists "notwithstanding that the Seller did not know the substance of the representation and warranty was inaccurate at the time the representation or warranty was made." SSA Section 2.04(b).

63.    MBIA thus has the contractual right to enforce the Repurchase Protocol and seek redress for Flagstar's failure to comply with its obligations to cure, repurchase, or substitute breaching loans.  As noted below, however, the parties agreed that in the event of a material default under the Insurance Agreement, the Repurchase Protocol is not an exclusive remedy, and that MBIA may pursue all remedies available at law or in equity.

64.    The Repurchase Protocol was intended to be an efficient remedy to address the inadvertent inclusion in the Transactions of an aberrant breaching loan.  The remedy was not designed, and is not adequate, to address the enormous volume of breaching loans, and is inadequate to handle Flagstar's wholesale failure to comply with its express warranties.

---

[7] FCMC is a Representing Party as Seller under the 2007-1 PSA.

Flagstar admitted this fact in correspondence with MBIA, noting that the Repurchase Protocol is not manageable for the "high-volume" of demands issued by MBIA, based upon the overwhelming number of breaching loans MBIA identified.

65.     Rather, it was fundamental to the parties' bargain that Flagstar would accurately represent its operational practices and the pool characteristics, convey to the Trusts only loans that bore the represented attributes confirmed by the Loan Warranties, and cure or repurchase the rare loan that circumvented its purported controls.  Flagstar utterly eviscerated this bargain by conveying to the Trusts a large volume of breaching loans and, thereafter, by failing to provide notice of the breaches and refusing to comply with its contractual commitment to remove and cure or repurchase the breaching loans.

### D.     MBIA Obtains Additional Contractual Remedies

66.     Mortgage-backed securitizations do not always include financial guaranty insurance.  To induce financial guarantors such as MBIA to issue insurance policies, the sponsors of the securities provide insurers with additional warranties, i.e., the Transaction Warranties, that go beyond those made to other parties to the transaction.  The sponsors also provide additional remedies not available to the noteholders.  These securitizations were no exception.

67.     In addition to the Repurchase Protocol available for breaches of the Loan Warranties, the Insurance Agreements afford MBIA broad remedies to address breaches by Flagstar of the Loan and Transaction Warranties.

68.     *All remedies at law or equity.*  Under Section 5.01(a) of both Insurance Agreements, an Event of Default under the Insurance Agreement exists if:

> any representation or warranty ... shall prove to be untrue or incomplete in any material respect except if the representation or warranty was made in accordance with Section 2.04 of the Sale

and Servicing Agreement [or Section 2.03(b) of the PSA], in which case, following the Seller's acceptance of transfer of the particular Mortgage Loan and required deposit into the Collection [or Certificate] Account or substitution of an Eligible Substitute Mortgage Loan [or a Replacement Mortgage Loan] there shall be no default.

69.     In other words, an Event of Default occurs under the Insurance Agreements (i) with respect to the breach of a Loan Warranty unless and until Flagstar removes and repurchases or substitutes the breaching loan pursuant to the Repurchase Protocol; or (ii) in the event of a material breach of the Transaction Warranties.

70.     Moreover, upon an Event of Default, MBIA may seek any remedies available at law or in equity.  Section 5.02 of both Insurance Agreements provides that "[u]nless otherwise expressly provided, no remedy herein [the Insurance Agreement] conferred upon or reserved is intended to be exclusive of any other available remedy, but each remedy shall be cumulative and shall be in addition to other remedies given under the Transaction Documents or existing at law or in equity."[8]  No exclusive remedy is provided for in the Insurance Agreements for an Event of Default predicated upon the material breach of the Insurance Agreements as a whole, including for a material breach of the Transaction Warranties, pervasive Loan Warranty breaches, or complete frustration of the Repurchase Protocol.

71.     *Reimbursement.*  Section 3.03(b) of the Insurance Agreements provides that Flagstar shall reimburse MBIA for "payments made under the Policy arising as a result of [Flagstar's[9]] failure to repurchase any Mortgage Loan required to be repurchased."  Section 3.03(c) further provides that MBIA "shall be entitled to reimbursement for any and all

---

[8] "Transaction Documents" refers to the Purchase Agreements, 2006-1 SSA, 2007-1 PSA, the Insurance Agreements, and other agreements related to the Transactions.
[9] Flagstar Bank agreed to reimburse MBIA under Section 3.03(b) of the 2006-1 Insurance Agreement. Flagstar Bank and FCMC agreed to reimburse MBIA under Section 3.03(b) of the 2007-1 Insurance Agreement.

reasonable charges, fees, costs and expenses that the Insurer may reasonably pay or incur, including, but not limited to, reasonable attorneys' and accountants' fees and expenses, in connection with … the enforcement or defense or preservation by [MBIA] of any rights in respect of any of the Transaction Documents."

72.     *Interest.* Section 3.03(d) of the Insurance Agreements further entitles MBIA to interest on any reimbursement amounts due.

## IV.   MBIA DISCOVERS PERVASIVE BREACHES AMONG THE SECURITIZED LOANS

73.     As noted above, following an inordinate number of defaults on the loans in both of the securitizations, which defaults resulted in MBIA making claim payments under the Policies, MBIA sought and obtained access to review loan origination files.

74.     At substantial expense, MBIA's litigation counsel retained a third-party consultant to review the files created during the origination of the loans for compliance with the underwriting guidelines, evidence of fraud, and other breaches of warranties.

75.     In a sample of 404 delinquent, defaulted, or charged-off loans and 712 randomly-selected loans from the 2006-1 Transaction, MBIA identified breaches of the Flagstar representations and warranties in over 90% of the loans.  MBIA also reviewed a sample of 734 randomly selected and 1137 delinquent, defaulted, or charged-off loans from the 2007-1 Transaction, and identified breaches of Flagstar's representations and warranties in over 90% of the loans.

76.     The breaching loans contain defects that constitute a breach of at least one, but in most cases several, of Flagstar's numerous Loan Warranties.  These defects include:

- Rampant fraud and error rates, involving the misrepresentation or miscalculation of borrower income, employment, assets, or intent to occupy the property as a primary residence;

- Pervasive violations of Flagstar's actual underwriting standards and prudent and customary origination and underwriting practices, such as qualifying borrowers under reduced documentation programs who were ineligible for those programs, failing to check borrower employment or reserves, systemic failure to conduct the required income-reasonableness analysis for stated income loans, and lending to borrowers whose actual debt-to-income ratios exceeded the program maximums;

- Defective or missing appraisals, leading to false and misleading calculations of CLTV; and

- Missing documents, the absence of which may constitute a basis for the borrower to rescind the mortgage loan, a breach of the program guidelines, or negligence on the part of the underwriter.

77.     Each of the identified breaches of the Loan Warranties materially and adversely affected MBIA's interests in the breaching loans as of the time that MBIA issued the respective Policies, and increased the risk of loss to MBIA on the Policies.  Loans that were not appropriately originated and underwritten, or with key attributes misrepresented, are less valuable to the securitizations, and a greater insurance risk, than loans not bearing those defects. The large number of breaching loans discovered by MBIA in the sample of loans it reviewed indicates that the pool as a whole is riddled with breaching loans.  MBIA would not have agreed to issue the Policies had Flagstar provided MBIA with truthful information about the defects and defect rates on the loans.

78.     The pervasive breaches of the Loan Warranties also demonstrate the material falsity of the information Flagstar provided MBIA about its origination operations and quality control procedures, and increased the risk of loss to MBIA on the Policies.  The inaccurate, false and misleading information that Flagstar provided to MBIA materially and adversely impacted MBIA's interests in the Transactions, as MBIA relied upon the warranted information as fundamental to its risk assessment and therefore its willingness to issue the

Policies. Flagstar's failure to follow its represented and warranted business practices resulted in its origination, acquisition, and securitization of riskier loans than were represented to MBIA, which materially increased MBIA's risk of loss on the Policies. Had Flagstar provided MBIA with truthful disclosures – i.e., that Flagstar had systematically departed from its written policies and procedures – MBIA would not have issued the Polices.

79.     Moreover, the magnitude of the breaches when considered together indicates that the pool-wide data supplied by Flagstar to MBIA was untrue and misleading. Based upon the conclusions drawn from MBIA's re-underwriting samples, on a poolwide basis, the loans materially departed from the characteristics and attributes represented in the various loan tapes. The number and nature of the defects identified in MBIA's review indicates that the loans securitized in both Transactions were systematically originated with virtually no regard for the borrowers' ability or willingness to repay obligations, the fundamental precept of mortgage lending. Rather, the review indicates that borrowers were permitted or encouraged to take out loans that they obviously could not afford to repay. Thus, the aggregate risk that MBIA insured was not the risk associated with the loan quality represented and warranted by Flagstar. MBIA would not have agreed to issue the Policies if it had been provided accurate information prior to the Transactions.

80.     In short, nearly all of the loans that Flagstar sold to each of the Trusts deviated from the warranted characteristics, which characteristics MBIA deemed fundamental to its evaluation of the risk associated with issuing the Policies and its decision to participate in the Transactions. These breaches increased MBIA's risk of loss on the Policies.

## V.     FLAGSTAR FRUSTRATES THE REPURCHASE PROTOCOL

81.     Based upon Flagstar's role as the originator or acquirer of the securitized loans, as well as its role as the original Servicer, Flagstar had notice of the pervasive breaches as

of the closing of the securitizations, even before September 17, 2010, when MBIA and/or the Trustee provided notice to Flagstar, in accordance with Section 2.04(c) of the SSA and Section 2.03(f) of the PSA, of 762 loans in the 2006-1 Transaction and 1601 loans in the 2007-1 Transaction that breach applicable representations and warranties.  In the September 2010 notices, MBIA and/or the Trustee demanded that Flagstar comply with its obligations under the respective Repurchase Protocols to cure, substitute, or repurchase the affected loans.[10]  As part of MBIA's notice, Flagstar was provided with the conclusions of MBIA's review for each loan put back, detailing the reasons why each loan breached one or more warranties.  Thus, Flagstar was clearly placed on notice of pervasive loan breaches within each of the Transactions, and constructive notice of similar pervasive breaches throughout the unsampled loans in the two Transactions based upon the represented uniform characteristics of the loan pools.  These notices triggered Flagstar's repurchase requirements without further notice of loan-by-loan breaches.

82.    Flagstar responded to MBIA's repurchase demands in a letter dated February 11, 2011 and repudiated its obligations under the Repurchase Protocol, refusing even to consider whether it should remove and repurchase the loans identified by MBIA based upon the identified breaches.  Instead, of the over 2300 loans for which MBIA demanded repurchase, Flagstar reviewed just 5% of the repurchase demands – 127 loans in total – all from the 2007-1 Transaction.  On the basis of its review of 127 loans, Flagstar refused to repurchase *any* of the more than 2300 breaching loans identified by MBIA.  Even crediting all of these purported rebuttals, which MBIA does not, Flagstar has refused to identify any basis for failing to repurchase more than 94% of the breaching loans of which it received notice in September 2010.

---

[10] The Repurchase Protocol in both Transactions expressly contemplates repurchase of loans that are defective but for which payments are still being made.  *See* SSA Section 2.07(c)  (2006-1 Transaction), PSA Section 2.05(a) (2007-1 Transaction).

Nonetheless, Flagstar did not cure any of the undisputed breaches identified by MBIA, and has refused to repurchase or substitute a single loan of the thousands identified by MBIA.[11]

83.     On August 31, 2011, MBIA notified Flagstar that Flagstar had defaulted under the Insurance Agreements for failing to have cured or repurchased any of the breaching loans, of which Flagstar had received notice nearly a year earlier.  Flagstar responded on September 22, 2011, admitting that on September 17, 2010 MBIA provided notice to Flagstar of more than 2,300 breaching loans, and acknowledging that Flagstar had not complied with its repurchase obligation within the requisite time frame specified under the Transaction Documents.  Flagstar again reiterated its refusal – stated in its February 11, 2011 letter – to repurchase any of the loans, despite having no rebuttal at all (much less a valid rebuttal) to approximately 2,200 breaching loans.

84.     Incredibly, Flagstar proposed that MBIA *waive* Flagstar's default of the Insurance Agreements and provide Flagstar with an ***additional*** six months to review the balance of MBIA's repurchase demands, which it should have done nearly a year earlier under the terms of the contracts.  Given Flagstar's failure to review thousands of loans, more than a year after having been notified of their breaches, and its refusal to repurchase even a single one of the breaching loans MBIA identified, MBIA rejected that "offer" in a letter dated October 4, 2011, reserving its right to immediately seek legal remedies.  Perhaps recognizing that litigation was imminent based upon, *inter alia*, its frustration of the Repurchase Protocol, in a letter dated October 12, 2011 Flagstar made a last ditch effort to delay its day of reckoning, now offering –

---

[11] Flagstar's refusal to repurchase *any* of the thousands of breaching loans identified by MBIA is striking given the testimony of Flagstar executive Matthew Roslin in *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB.*, No. 11–CIV–2375 (S.D.N.Y. 2011), that "for years and years and years, certainly as long as I've been in the industry, there are repurchases in the normal course.  There are errors made.  There are origination errors that warrant repurchase . . . ."  Buchdahl Decl. dated Jan. 23, 2012 (Docket No. 70), Ex. B, Dep. of Matthew Roslin, at 49:20-24.

without requiring MBIA's waiver of Flagstar's default (as it previously had) – to review MBIA's repurchase demands "over the course of the next few months." Flagstar did not agree to repurchase any of the breaching loans previously identified.

85. Since its October 12, 2011 letter, Flagstar has not provided any responses to MBIA's repurchase demands, as it represented it would.

86. Flagstar's refusal to address all of the defective loans reveals a disregard of its obligations under, and frustration of, the Repurchase Protocol for each Transaction. Flagstar has frustrated MBIA's attempt to enforce the Repurchase Protocol for each Transaction, such that the remedy has been rendered futile and without value.

## VI.    FLAGSTAR'S PATTERN OF MISCONDUCT IN SECURITIZATIONS

87. MBIA's experience with Flagstar's misrepresentations is not unique. Flagstar settled a suit brought against it by the United States, alleging claims under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, breach of fiduciary duty, gross negligence, and negligence stemming from Flagstar's involvement with a mortgage insurance program run by the Federal Housing Administration of the Department of Housing and Urban Development. *United States v. Flagstar, FSB.*, No. 12–CIV–1392 (S.D.N.Y. 2012). In its complaint, the United States details both known systemic failures in Flagstar's underwriting procedures – involving lack of appropriate supervision and involvement by underwriters, and a compensation scheme that rewarded volume over quality – as well as numerous specific underwriting errors on individual loans.

88. As part of the February 24, 2012 settlement, Flagstar *admitted* that, since at least 2002, it falsely certified that experienced underwriters would "personally review" all relevant loan origination documents on manually underwritten loans. Flagstar further admitted that, "in a number of instances, notwithstanding loan-level certifications to the contrary,"

Flagstar submitted loans that did not comply with relevant underwriting requirements.  To settle claims related to its admitted underwriting failures, Flagstar agreed, among other things, to pay approximately $133 million and submit to special compliance monitoring.

89.     Flagstar's admitted failings compromised its loan underwriting from 2005 through 2007, which is the time frame relevant to the Transactions at issue in this action.  These admissions are therefore further evidence of the falsity of Flagstar's representations to MBIA regarding its operations and underwriting process.

90.     In *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, No. 11–CIV–2375 (S.D.N.Y. 2011), a pending federal court action, another financial guarantor has sued Flagstar for providing false assurances as to the quality of the securitized loans and for failing to honor its contractual obligations with regard to two loan securitizations in 2005 and 2006.  In that action, Assured has uncovered evidence of systemic failures of, and knowing disregard for, prudent and actual origination, underwriting, quality control, and securitization processes at Flagstar.

91.     For example, Assured has obtained testimony from a Flagstar executive that Flagstar, in determining which loans to include in the deals, "empt[ied] the cupboard," and put the "kitchen sink" into those securitizations, without conducting  loan-level quality control reviews of the selected loans prior to making representations and warranties about the collateral. Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. 3, *Assured*, No. 11–CIV–2375 (S.D.N.Y. 2011).  Another Flagstar executive testified that "we have been very concerned about our underwriting practices."  *Id*. at 4.  Assured also discovered that Flagstar had specifically identified more than one hundred loans in the deal as evidencing fraud, but never notified the guarantor of any problems with the loans.  *Id*. at 5-6, 23.  And as with MBIA, Assured also

examined its loans and found that a large percentage of loans in its pools – 76.25% of the loans

in its random sample – violated the representations and warranties made by Flagstar. *Id.* at 4,

Defs.' Mem. in Supp. of Mot. for Summ. J. 8, *Assured*, No. 11–CIV–2375 (S.D.N.Y. 2011).

92.     Both MBIA and Assured dealt with Flagstar during the same 2005-2007

time period.  Accordingly, the evidence of systemic failures in Flagstar's securitization machine

uncovered in *Assured v. Flagstar*, including the evidence that Flagstar was aware of these

problems, applies equally here to demonstrate the falsity of Flagstar's representations to MBIA

about its operations.

## VII.   MBIA HAS BEEN GRIEVOUSLY HARMED

93.     MBIA would not have issued the Policies had Flagstar not provided the

contractual warranties that have been overwhelmingly breached.  The pervasive

misrepresentations and breaches undermine the fundamental bargain struck by the parties:  The

loans sold into the 2006-1 and 2007-1 Trusts simply do not reflect the attributes represented and

warranted.

94.     MBIA has accordingly been damaged.  It has paid more than $165 million

in claim payments on the two Transactions and anticipates millions more, in addition to

extraordinary remediation costs.

## FIRST CAUSE OF ACTION:
## BREACH OF WARRANTY

95.     MBIA re-alleges and incorporates by reference the foregoing paragraphs

of this Complaint.

96.     The Insurance Agreements are valid and binding agreements between

MBIA and Flagstar.

97.    MBIA has performed all of its obligations under the Insurance Agreements.

98.    Flagstar has materially breached the Transaction Warranties and Loan Warranties.

99.    MBIA has been damaged and will continue to be damaged in an amount to be determined at trial.

## SECOND CAUSE OF ACTION:
## BREACH OF REPURCHASE PROTOCOL

100.    MBIA re-alleges and incorporates by reference the foregoing paragraphs of this Complaint.

101.    As of the close of the Transactions, based upon, among other facts, its knowledge that it had deviated substantially from its represented and warranted origination and underwriting practices, Flagstar had notice that the loan pools it sold into the Transactions were replete with loans that breached the Loan Warranties.

102.    Moreover, by letters dated September 17, 2010, MBIA provided notice to Flagstar of loans that breach the Loan Warranties, and by a letter dated October 1, 2010, the Bank of New York Mellon Trust Company, N.A., which serves as trustee for the securitizations, has provided notice to Flagstar of loans that breach the Loan Warranties.

103.    Flagstar materially breached its obligations under Section 2.04(d) of the SSA (for the 2006-1 Transaction), and Section 2.03(f) of the PSA (for the 2007-1 Transaction) by failing to provide prompt notice of the breaches of the Loan Warranties, and by failing to cure, repurchase, or substitute loans that breach the Loan Warranties, pursuant to the Repurchase Protocol.

104.     Flagstar's repudiation of its obligation to evaluate the loans in good faith for repurchase, and thereafter repurchase the breaching loans, based upon the breaches identified by MBIA, constitutes a frustration of the Repurchase Protocol that renders the remedy futile.

105.     MBIA has incurred and will continue to incur damages, in an amount to be proved at trial, as a result of Flagstar's breach of contract.

### THIRD CAUSE OF ACTION:
### MATERIAL BREACH OF THE INSURANCE AGREEMENTS

106.     MBIA re-alleges and incorporates by reference the foregoing paragraphs of this Complaint.

107.     Flagstar induced MBIA to enter into the Insurance Agreements and to issue the Policies by making the Transaction Warranties and Loan Warranties, and committing to comply with its obligations under the Repurchase Protocol.

108.     Flagstar's breaches of the Transaction Warranties and pervasive breaches of the Loan Warranties constitute a material breach of the Insurance Agreements, materially increase MBIA's risk of loss, damage, and injury within the coverage of the Policies and the Insurance Agreements, and are so substantial and fundamental as to defeat the object of the parties in entering into the contracts.

109.     Flagstar's repudiation and frustration of the Repurchase Protocol also constitutes a material breach of the Insurance Agreements.

110.     MBIA has been harmed and will continue to be harmed by Flagstar's material breach of the Insurance Agreements.

### FOURTH CAUSE OF ACTION:
### REIMBURSEMENT

111.     MBIA re-alleges and incorporates by reference the foregoing paragraphs of this Complaint.

112.    Pursuant to Section 3.03(b) of the Insurance Agreements, Flagstar Bank and/or FCMC agreed to reimburse MBIA for payments made under the Policies arising as a result of their failure to repurchase any Trust Loan required to be repurchased pursuant to the Repurchase Protocol.

113.    Pursuant to Section 3.03(c) of the Insurance Agreements, MBIA is entitled to reimbursement for any and all charges, fees, costs, and expenses paid or incurred in connection with, among other things, enforcing, defending, or preserving MBIA's rights under the Transaction Documents.

114.    Pursuant to Section 3.03(d) of the Insurance Agreements, MBIA is entitled to  interest on the amounts to be reimbursed under Sections 3.03(b) and 3.03(c).

115.    MBIA has made payments under the Policies arising as a result of Flagstar's failure to repurchase loans required to be repurchased by Flagstar pursuant to the Repurchase Protocol and has incurred expenses, including attorneys' fees and expert fees, in seeking to enforce its rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

(i)     An award of compensatory, consequential, and/or equitable damages, and any other damages to be proven at trial, for Flagstar's pervasive and material breaches of its representations and warranties and its contractual repurchase obligations under the Repurchase Protocol, both of which constitute material breaches of the Insurance Agreements and frustration of the parties' bargains;

(ii)    An order compelling Flagstar to comply with its obligations under the Repurchase Protocol, to cure, repurchase, or substitute the loans that breach the contractual representations and warranties, or, alternatively, an award of damages for Flagstar's failure to comply with its obligations under the Repurchase Protocol;

(iii)   An order awarding reimbursement of MBIA's claim payments and attorneys' fees, and other costs and expenses incurred in enforcing, defending, or preserving its rights under the Transaction Documents, and interest thereon, pursuant to Section 3.03 of the Insurance Agreements;

(iv)    An order of prejudgment interest; and,

(v)     An order awarding MBIA such other and further relief as the Court deems just and proper.

Dated: New York, New York

_January 11___, 2013

PATTERSON BELKNAP WEBB & TYLER LLP


_Erik Haas_____
Erik Haas
Nicolas Commandeur
David Slarskey
Matthew Funk
1133 Avenue of the Americas
New York, NY  10036-6710
Telephone:  (212) 336-2000
Fax:  (212) 336-2222

*Attorneys for MBIA Insurance Corporation*

38